UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

CITY OF NEWBURGH,

                       Plaintiff,

     vs.

UNITED STATES OF AMERICA, UNITED STATES
DEPARTMENT OF DEFENSE, UNITED STATES AIR
NATIONAL GUARD BUREAU, UNITED STATES
AIR FORCE, STATE OF NEW YORK, NEW YORK
AIR NATIONAL GUARD, NEW YORK STATE
DEPARTMENT OF TRANSPORTATION, PORT
AUTHORITY OF NEW YORK AND NEW JERSEY,
NATIONAL EXPRESS GROUP, PLC, SWF AIRPORT
ACQUISITION, INC., FEDERAL EXPRESS
CORPORATION, THE 3M COMPANY (f/k/a
MINNESOTA MINING AND MANUFACTURING,
CO), TYCO FIRE PRODUCTS L.P., Successor-In-
Interest to the ANSUL COMPANY, BUCKEYE FIRE
EQUIPMENT COMPANY, CHEMGUARD, INC., FIRE
SERVICE PLUS, INC., UNITED TECHNOLOGIES
CORPORATION, KIDDE PLC INC., KIDDE FIRE
FIGHTING, INC., ANGUS INTERNATIONAL
SAFETY GROUP, LTD., ANGUS FIRE ARMOUR
CORPORATION, NATIONAL FOAM INC., CHUBB
FIRE, LTD., and JOHN DOES 1-10,

                       Defendants.

_____

**COMPLAINT**

Civil Action No. _____

**TRIAL BY JURY
REQUESTED**

Plaintiff **CITY OF NEWBURGH** ("City"), by and through its attorneys, Knauf Shaw LLP,

Rodenhausen Chale, LLP, and Hodges, Walsh, Messemer & Burke LLP, for its Complaint, states

as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff City of Newburgh ("City") brings this action as: 1) the owner of real property ("City Property")[1] in the Towns of New Windsor and Newburgh containing the Washington Lake Reservoir ("Washington Lake"), the primary water supply for the City, portions of the City's drinking water reservoir watershed ("City Watershed")[2], and other parts of the City's public water supply and distribution system ("City Water System"); 2) as a user of waters that flow through the City Watershed; and 3) as the operator of this public water supply system for City residents, businesses and other water users, as more fully described below.

2.      In this action, the City of Newburgh ("City") complains of discharge(s) ("Discharge(s)"), release(s) ("Release(s)"), spill(s) and/or disposal(s) (together Discharges, Releases, spills, and disposals will be referred to as "Disposal(s)") of solid or hazardous waste materials ("Hazardous Waste") and/or other hazardous substances ("Hazardous Substances"), including but not limited to per- and polyfluoralkyl substances ("PFAS"), (altogether the "Pollutants") at New York Stewart International Airport ("Airport"), referred to in this Complaint as the "Airport Property," and Stewart Air National Guard Base ("Base"), referred to in this Complaint as the "Base Property," causing continuing surface, groundwater, soil, and sediment contamination ("Contamination") of the City Watershed supplying Washington Lake.

3.      These Disposals, either with a permit, without a permit, or in violation of a permit or permits, have led to the Contamination at the Base Property, the Airport Property, Washington Lake, and the City Watershed, and present or may present an imminent and substantial endangerment to health and/or the environment.

4.      This action arises from the negligent, intentional, wrongful, and/or illegal non-

---

[1] The term "City Property" is defined below in paragraph 153.
[2] The term "City Watershed" is defined below in paragraph 126.

discretionary acts and/or omissions leading to the Contamination of Washington Lake, the City Watershed, the Base Property, and the Airport Property, and injuries to the City Property, City Water Supply, City Watershed, and Washington Lake.

5.      This action is brought against Defendants who manufactured the Pollutants, disposed of and/or dispose of the Pollutants, owned and/or own the land, and/or lease and/or leased the land where the Disposals occurred and/or are occurring, as further described below.

6.      The Disposals may create an imminent and substantial hazard to health and the environment, and are a public nuisance.

7.      Defendants have failed to adequately investigate and remediate the Contamination in or at Washington Lake, the City Watershed, the Base Property, and the Airport Property.

8.      While the New York State Department of Environmental Conservation ("NYSDEC") has embarked upon an Interim Remedial Measure ("IRM") to install a granulated activated carbon ("GAC") filtration system to address only two of the twelve PFAS found in the City Watershed, perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), that IRM is not likely to fully protect the City and its residents and water users from the Contamination.

9.      As a result of the Contamination of Washington Lake, from on or about June 7, 2016 to the present date, the City has provided its residents water from the Catskill Aqueduct, through an agreement with the New York City Department of Environmental Protection ("NYCDEP"), using funding from the State.

10.     Pursuant to the Resource Conservation and Recovery Act ("RCRA"), and the Clean Water Act ("CWA"), and common law, Plaintiff seeks an injunction generally requiring that Defendants promptly halt Disposals of PFAS at the Base Property and Airport Property by using a firefighting foam not containing PFAS; install an IRM to stop PFAS from entering Washington

3

Lake and the City Watershed; requiring that all IRMs treat all PFAS to their Method Detection Limits; immediately investigate and remediate the Contamination in or at Washington Lake, the City Watershed, the Base Property and the Airport Property; and pay for continued use of an alternative clean water supply and associated costs until remediation is complete.

11.    Plaintiff also seeks compensatory damages, equitable or implied indemnification, and restitution.

12.    These damages include property damages for the substantial diminution of value of the City Property, increased property taxes, legal costs to challenge tax assessments, and lost value of, and profits from, the City Water System.

13.    A putative class action lawsuit has been brought by City residents and water users against the City, as the supplier of water contaminated by Defendants, in New York State Supreme Court, Orange County, captioned *Rosemary Reeves et al. v. City of Newburgh*, Index No. EF007713-2017 ("State Court Action").

14.    This action also seeks indemnification and/or contribution for the claims brought in the State Court Action, and any and all claims brought against the City arising out of the Disposals of PFAS.

## THE PARTIES

15.    The City is a municipal corporation with offices at 83 Broadway, Newburgh, New York 12550.

16.    Defendant United States of America ("USA") maintains offices at the offices of the President at the White House, 1600 Pennsylvania Avenue, Washington, D.C.

17.    Defendant United States Department of Defense ("DOD") is a department of the federal government of the United States, with headquarters at the Pentagon, Washington, D.C.

20301.

18.     Defendant United States Air National Guard Bureau ("USANG") is a bureau of DOD, with headquarters at 1636 Defense, Pentagon Suite 1E169, Washington, D.C. 20301-0001.

19.     Defendant United States Air Force ("USAF") is a branch of the United States Armed Forces and one of the military departments of the DOD, with headquarters at the Pentagon, Washington, D.C. 20301-0001.

20.     Collectively, Defendants USA, DOD, USANG, and USAF are referred to in this Complaint as the "Federal Defendants."

21.     Defendant State of New York ("State") is a state with offices at the New York State Capitol Building, State Street and Washington Avenue, Albany, New York 12224.

22.     Defendant New York Air National Guard ("NYANG") is the Air Force militia of the State, with offices at 330 Old Niskayuna Road, Latham, New York 12110.

23.     Upon information and belief, NYANG is under the jurisdiction of the Governor of the State.

24.     Defendant New York State Department of Transportation ("NYSDOT") is an agency of the State with offices at 50 Wolf Road, Albany, New York 12232.

25.     Collectively, Defendants State, NYANG, and NYSDOT are referred to in this Complaint as "State Defendants."

26.     Defendant Port Authority of New York and New Jersey ("PANYNJ") is a bi-state public agency with offices at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007.

27.     Defendant National Express Group, PLC ("NEG") is a foreign corporation with offices at National Express House, Birmingham Coach Station, Mill Lane, Digbeth Birmingham,

United Kingdom B5 6DD.  Upon information and belief, NEG is registered in England and Wales with a registered number of 2590560.

28.    Upon information and belief, NEG is or formerly was a parent company of Defendant SWF Airport Acquisition, Inc.

29.    Defendant SWF Airport Acquisition, Inc. ("SWF") is a Delaware corporation, with headquarters at National Express House, Birmingham Coach Station, Mill Lane, Digbeth Birmingham, United Kingdom B5 6DD.

30.    Upon information and belief, SWF was formerly or is the subsidiary of Defendant NEG.

31.    Collectively, NEG and SWF are referred to in this Complaint as the "NEG Defendants."

32.    Defendant Federal Express Corporation ("FedEx") is a Delaware corporation authorized to do business in New York, with offices at 3610 Hacks Cross Road, Memphis, Tennessee 38120.

33.    Upon information and belief, FedEx conducts operations at the Airport Property.

34.    Defendant The 3M Company ("3M") (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation authorized to do business in New York, with principal offices at 3M Center, St. Paul, Minnesota 55144.

35.    Defendant Tyco Fire Products L.P. ("Tyco"), is a Delaware limited partnership authorized to do business in New York, with principal offices at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.  Upon information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul").

36.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina

corporation, with principal offices at 110 Kings Road, Kings Mountain, North Carolina 28086.

37.     Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation, with principal offices at One Stanton Street, Marinette, Wisconsin 54143-2542.

38.     Defendant Fire Service Plus, Inc. ("Fire Service") is a Georgia corporation, with principal offices at 180 Etowah Trace, Fayetteville, Georgia 30214.

39.     Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation authorized to do business in New York, with principal offices located at 10 Farm Springs Road, Farmington, Connecticut 06032.

40.     Defendant Kidde PLC Inc. ("Kidde") is a Delaware corporation authorized to do business in New York, with principal offices located at One Carrier Place, Farmington, Connecticut 06034.  Upon information and belief, Kidde was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

41.     Defendant Kidde Fire Fighting, Inc. ("Kidde Fire Fighting") is a Pennsylvania corporation with principal offices at 400 Main Street, Ashland, Massachusetts 01721.   Upon information and belief, Kidde Fire Fighting was formerly known as National Foam, Inc., National Foam System, Inc., and/or Chubb National Foam, Inc.

42.     Defendant Angus International Safety Group, Ltd. ("Angus International") is a foreign private liability company, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom LA2 7NA.  Upon information and belief, Angus International is registered in England with a registered number of 8441763.

43.     Defendant Angus Fire Armour Corporation ("Angus Fire") is a Delaware corporation, with principal offices at 141 Junny Road, Angier, North Carolina 27501.

44.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation, with

principal offices at 141 Junny Road, Angier, North Carolina 27501.

45.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in England with a registered number of 134210.  Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

46.    Collectively, defendants 3M, Tyco, Buckeye, Chemguard, Fire Service, United Technologies, Kidde, Kidde Fire Fighting, Angus International, Angus Fire, National Foam, and Chubb are referred to in this Complaint as the "Manufacturer Defendants."

## JURISDICTION AND VENUE

47.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §1331, because this case arises under the laws of the United States of America; specifically, because the First Cause of Action is predicated upon and seeks relief pursuant to RCRA, 42 U.S.C. §6901, *et seq.*, the Second Cause of Action is predicated upon and seeks relief under CWA, 33 U.S.C. §1251 *et seq.*, and the Third Cause of Action is predicated upon and seeks relief under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 *et seq*.

48.    This Court also has jurisdiction pursuant to CWA §505, 33 U.S.C. §1365(a), RCRA §7002, 42 U.S.C. §6972(a), and CERCLA §113, 42 U.S.C. §9613(b).

49.    This Court has supplemental jurisdiction over the claims arising under New York State law that are set forth in the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Causes of Action, pursuant to 28 U.S.C. §1367, which are so related to the

claims in the First, Second, and Third Causes of Action that they form part of the same case or controversy.

50.    In addition, the Declaratory Judgments Act, 28 U.S.C. §2201, authorizes this Court to grant declaratory relief in this matter.

51.    Venue is proper in this federal District Court pursuant to CERCLA §113(b), 42 U.S.C. §9613(b), RCRA §7002, 42 U.S.C. §6972(a), and CWA §505, 22 U.S.C. §1365(a), because the Disposals, Discharges, and Releases occurred within the Southern District of New York, and pursuant to 28 U.S.C. §1391(b)(2), because the Airport Property, the Base Property, the City Watershed, and Washington Lake are located within the Southern District of New York, and because the events related to the claims in this Complaint occurred within the Southern District of New York.

52.    The City is not required to file a notice of intention to file a claim with respect to tort claims against the State Defendants because this Complaint seeks injunctive relief and incidental damages.

53.    Federal Defendants have waived their sovereign immunity pursuant to RCRA §6001(a), 42 U.S.C. §6961(a), CWA §313, 42 U.S.C. §1323(a), and CERCLA §120(a)(1), 42 U.S.C. §9601(a)(1).

**GENERAL ALLEGATIONS**

I.    **PER- AND POLYFLUOROALKYL SUBSTANCES**

    A.    **Overview**

54.    Per- and polyfluoroalkyl substances ("PFAS"), also referred to as perfluorinated chemicals ("PFCs"), are a family of synthetic chemicals containing fluorine and carbon atoms.

55.    PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid, and are thus effective in products which require fire resistance, and oil, stain, grease, and water repellency.[3]

56.    PFAS are or have been found in firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.[4]

57.    Upon information and belief, there have been hundreds of PFAS manufactured, distributed, and sold in the United States.

58.    As of the current date, NYSDEC analyzes sediment, surface water, and groundwater for only 21 out of the hundreds of the PFAS compounds, including:

| Table 1 |
| --- |
| Perfluorobutanoic acid ("PFBA") |
| Perfluoropentanoic acid ("PFPeA") |
| Perfluorohexanoic acid ("PFHxA") |
| Perfluoroheptanoic acid ("PFHpA") |
| Perfluorooctanoic acid ("PFOA") |
| Perfluorononanoic acid ("PFNA") |
| Perfluorodecanoic acid ("PFDA") |
| Perfluoroundecanoic acid ("PFUnA") |
| Perfluorododecanoic acid ("PFDoA") |
| Perfluorotridecanoic acid ("PFTriA") |
| Perfluorotetradecanoic acid ("PFTeA") |

---

[3] *See* U.S. EPA, Per- and Polyfluoroalkyl Substances (PFASs) under TSCA, retrieved from https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/and-polyfluoroalkyl-substances-pfass-under-tsca (Last visited June 14, 2018).
[4] *Id.*

| |
|---|
| Perfluorobutanesulfonic acid ("PFBS") |
| Perfluorohexanesulfonic acid ("PFHxS") |
| Perfluoroheptanesulfonic acid ("PFHpS") |
| Perfluorooctanesulfonic acid ("PFOS") |
| Perfluorodecanesulfonic acid ("PFDS") |
| Perfluorooctane Sulfonamide ("FOSA") |
| N-methyl perfluorooctane sulfonamidoacetic acid ("NMeFOSAA") |
| N-ethyl perfluorooctane sulfonamidoacetic acid ("NEtFOSAA") |
| 6:2 Fluorotelomer sulfonate ("6:2FTS") |
| 8:2 Fluorotelomer sulfonate ("8:2FTS") |

59.     The two most widely known and studied PFAS are PFOA and PFOS.

60.     PFOS, a perfluoralkyl sulfonate, is an environmentally persistent anthropogenic chemical that is produced synthetically.

61.     PFOA, a perfluoralkyl carboxylate, is an environmentally persistent anthropogenic chemical that is also produced synthetically.

62.     PFASs were first invented in the 1930s.

63.     In or about 1966, aqueous film forming foam ("AFFF") containing PFAS was patented as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.[5]

64.     Upon information and belief, in 1969, DOD, by command of the Navy Department and Marine Corps, issued military specification MIL-F-24385 (amended in 1992), which includes the requirements for AFFF liquid concentrate to contain either 3% or 6% PFAS. Mil-F-2485 refers to 3% AFFF concentrate as "Type 3" and 6% AFFF concentrate as "Type 6."

65.     In the foam industry, concentrates are typically referred to as "3%" or "6%"

---

[5] *See* Remediation and Reuse Focus Group Federal Facilities Research Center, "Perfluorinated Chemicals (PFAS): Perfluorooctanoic Acid (PFOA) & Perfluorooctane Sulfonate (PFOS) Information Paper," dated August 2015, retrieved from https://clu-in.org/download/contaminantfocus/pops/POPs-ASTSWMO-PFAS-2015.pdf (last visited February 27, 2018).

concentrate, depending on the mixture rate with water, either 97% or 94% respectively. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3-1.8%.

66. AFFF, and other Class B fluorine-containing firefighting foams, have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations and civilian airports in the United States, including the Airport and the Base.[6]

67. AFFF concentrate containing PFAS is stored in above-ground storage tanks, underground storage tanks, and non-stationary containers.

68. At the time of a release and/or discharge of AFFF, the AFFF concentrate containing PFAS is mixed with a water source to make a liquid foam solution. The foam solution is then aerated at the nozzle, yielding finished foam that is applied to a fire.[7]

69. The AFFF coats the fire, blocking the supply of oxygen feeding the fire and creating a barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

70. Thousands of gallons of foam solution may be applied during a single release or discharge of AFFF.

71. AFFF has been released into the environment through a variety of practices and mechanisms:

- low volume releases of foam concentrate during storage, transfer, or equipment calibration;
- moderate volume discharge of foam solution for apparatus testing;
- occasional, high-volume, broadcast discharge of foam solution for firefighting and fire suppression/prevention;

---

[6] *See* Interstate Technical & Regulatory Council ("ITRC"), "History and Use of Per- and Polyfluoroalkyl Substances (PFAS)," dated November 2017, http://pfas-1.itrcweb.org/wp-content/uploads/2017/11/pfas_fact_sheet_history_and_use__11_13_17.pdf (last visited March 1, 2018).
[7] *Id.*

- periodic, high volume, broadcast discharge for fire training; and
- leaks from foam distribution piping between storage and pumping locations.[8]

72.     After the foam is released, spilled, discharged, or disposed into the environment, Safety Data Sheets ("SDSs") (f/k/a/ Material Safety Data Sheets ("MSDSs")) require that the foam be contained so it does not accumulate in sediment, soil, surface water and/or sewers, and groundwater.

73.     If it is not contained, the AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, surface water and/or sewers, and groundwater.

74.     For illustrative purposes only, Figure 4-1 below, from the Interstate Technical & Regulatory Council's ("ITRC")[9] Fact Sheet, "History and Use of Per- and Polyfluoroalkyl Substances (PFAS)," depicts the use and disposal of firefighting foam, how it may enter the environment, and potentially affected media, including groundwater, soil, sediment, and runoff to surface water and/or sewers.



**Figure 4-1. Release of firefighting foam**
*(Source: Adapted from figure by J. Hale, Kleinfelder, used with permission)*

---

[8] *Id.*

[9] According to its website, the ITRC "is a public-private coalition working to reduce barriers to the use of innovative air, water, waste, and remediation environmental technologies and processes. ITRC produces documents and training that broaden and deepen technical knowledge and expedite quality regulatory decision making while protecting human health and the environment. With public and private sector members from all 50 states and the District of Columbia, ITRC truly provides a national perspective." https://www.itrcweb.org/About/About (last visited March 6, 2018).

75.     The chemical structure of PFOA and PFOS, and other PFAS, makes them mobile and extremely resistant to breakdown in the environment and in human tissue.

76.     As a result of their chemical structure, PFOA and PFOS do not normally hydrolyze, photolyze, or biodegrade under environmental conditions, and are extremely persistent in the environment.[10]

77.     Studies have shown that PFOS and PFOA, and other PFAS, have the potential to bioaccumulate and biomagnify in wildlife and humans.[11]

**B.     Health Risks**

78.     In 2009, the United States Environmental Protection Agency ("EPA") issued Provisional Health Advisories ("Provisional Health Advisories") "to assess potential risk from exposure to [PFOS and PFOA] through drinking water,"[12] setting provisional health advisory levels of 200 parts per trillion ("ppt") for PFOS and 400 ppt for PFOA ("Provisional Levels"), but no sampling was required until 2012.

79.     The Provisional Health Advisories declared that "[e]pidemiological studies of exposure to PFOA [and PFOS] and adverse health outcomes in humans were inconclusive at that time."[13]

80.     However, in May 2016, EPA issued more stringent Health Advisories for PFOA and

---

[10] See U.S. EPA Emerging Contaminants Fact Sheet – PFOS and PFOA, dated May 2012, retrieved from https://nepis.epa.gov/Exe/tiff2png.cgi/P100EIVC.PNG?-r+75+-g+7+D%3A%5CZYFILES%5CINDEX%20DATA%5C11THRU15%5CTIFF%5C00000284%5CP100EIVC.TIF (last visited March 1, 2018).

[11] Id.

[12] See 2009 United States EPA Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), retrieved from https://www.epa.gov/sites/production/files/2015-09/documents/pfoa-pfos-provisional.pdf (last retrieved February 28, 2018).

[13] Id.

PFOS ("Health Advisories"), warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses adverse human health effects.[14]  The Health Advisories were announced on May 19, 2016, and published in the Federal Register on May 25, 2016.

81.    The risks include "developmental effects to fetuses during pregnancy or to breast-fed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), and other effects (e.g., cholesterol changes)."[15]

82.    While EPA has not issued Health Advisories for other PFAS to date, other PFAS compounds likely share similar health risks.  For example, EPA has also derived Regional Screening Level ("RSL") values for PFBS, for which there is a Tier 2 toxicity value.

83.    Studies completed in 2015 on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the Public Health Service and the U.S. Department of Health and Human Services, show that in addition to PFOA and PFOS, other PFAS may be adverse to human health and the environment.

84.    The ATSDR and the U.S. Department of Health and Human Services prepared a Draft Toxicological Profile for Perfluoroalkyls that was released for public comment on June 20, 2018 ("2018 ATSDR DTP").[16]

85.    The 2018 ATSDR DTP was prepared pursuant to CERCLA §104(i), 42 U.S.C. 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS.[17]

---

[14] *See* Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate ("Health Advisory), dated May 25, 2016, 19 Fed. Reg. 101.
[15] *Id*.
[16] *See Draft Toxicological Profile for Perfluoroalkyls*, dated June 2018, retrieved from https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf (last visited June 21, 2018).
[17] *Id*.

86.    The 2018 ATSDR DTP sets provisional minimal risk levels for the PFAS analyzed and concludes that several of the PFAS have long half-lives in humans and that there are associations between PFAS exposure and several adverse health outcomes.[18]

87.    The 2018 ATSDR DTP also finds that there is suggestive evidence that PFOA and PFOS are carcinogenic.[19]

### C.    Manufacturers

88.    Upon information and belief, since the 1960s, AFFF meeting MIL-F-24385 specifications were developed in coordination with the DOD by seven manufacturers and/or their subsidiaries to extinguish fires at military bases, airports, oil refineries, and firefighting training facilities throughout the United States, including 3M, Tyco, Buckeye, Chemguard, Fire Service, United Technologies, Kidde, Kidde Fire Fighting, Angus International, Angus Fire, National Foam, and Chubb.

89.    Defendant 3M was the primary manufacturer of PFOS.

90.    Upon information and belief, Defendant 3M developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS from approximately 1976 through the present.

91.    Upon information and belief, Defendants Tyco (and its predecessor Ansul) and National Foam developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS from approximately 1976 through the present.

92.    Upon information and belief, Kidde Fire Fighting developed, designed, manufactured, marketed, sold, and distributed AFFF containing PFAS from approximately 1991 through the present.

---

[18] *Id.*
[19] *Id.*

93.    Upon information and belief, Defendant Angus Fire developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS from approximately 1993 through the present.

94.    Upon information and belief, Angus International is the corporate parent of National Foam and Angus Fire.

95.    Upon information and belief, throughout the 1990's, Chubb, through its association with National Foam, obtained patents, under the name Chubb National Foam, Inc., for AFFF and similar firefighting foams, including Patent No. 5207932, dated May 4, 1993, for alcohol resistant AFFF.

96.    Upon information and belief, Chubb, through its association with National Foam, manufactured AFFF for the military during the early 2000's under the name Chubb National Foam, Inc.

97.    Upon information and belief, Defendant Chemguard developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS from approximately 1997 through the present.

98.    Upon information and belief, Kidde developed, designed, manufactured, marketed, sold, and distributed AFFF containing PFAS from approximately 2000 through 2013.

99.    Upon information and belief, United Technologies developed, designed, manufactured, marketed, sold, and distributed AFFF containing PFAS from approximately 2003 to 2013.

100.    Upon information and belief, Defendant Buckeye developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS from approximately 2003 through the present.

17

101.    Upon information and belief, Defendant Fire Service developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS from approximately 2010 to the present.

102.    Upon information and belief, between 2000 and 2002, Defendant 3M voluntarily phased out its production of some PFAS, but not all PFAS; and sold AFFF containing PFOS until about 2003.[20]

103.    Upon information and belief, AFFF developed, designed, manufactured, marketed, sold and distributed by the Manufacturer Defendants continues to contain PFAS other than PFOS and PFOA.

104.    Upon information and belief, by the 1970s, the Manufacturer Defendants and/or Federal Defendants knew of the risks of PFAS to the environment and health.

105.    The Manufacturer Defendants and/or the Federal Defendants had a duty, which they breached, to notify the United States Environmental Protection Agency ("EPA") when they had information that reasonably supported the conclusion that a substance or mixture presented a substantial risk of injury to health or the environment. *See* Toxic Substances Control Act ("TSCA") §8(e), 15 U.S.C. §2607(e).

106.    Prior to about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, and product packaging for AFFF.

107.    By about 1983, MSDSs for certain AFFF products directed users to collect AFFF prior to discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

---

[20]  NYSDEC Fact Sheet, Storage and Use of Fire Fighting Foams Fact Sheet, retrieved from http://www.dec.ny.gov/regulations/106078.html (last visited February 28, 2017).

108.    By 2010, SDSs for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and preventing entry into waterways, sewers, basements, or confined spaces.  For large spill releases, SDS procedures required diking the spill for later disposal, use of non-combustible materials such as vermiculite, sand, or earth to soak up the product, and placement of the product into a container for later disposal.

109.    By 2010, following product recovery, SDS procedures for certain AFFF products required flushing the area with water, and cleaning the surface thoroughly to remove residual contamination.  MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plant without permission.

110.    Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of all of the health and environmental risks of AFFF, or all of the precautions they should have taken, which Defendants knew or should have known existed.

111.    Upon information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles.[21]

112.    Upon information and belief, AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than 8 carbon atoms ("Long Chain PFAS") (like PFOS and PFOA) continue to be developed, manufactured, and sold by the Manufacturer Defendants.

113.    Upon information and belief, Short Chain PFAS also accumulate in blood and other tissues, and will persist indefinitely in the environment, posing threats to the environment and health.

---

[21] USEPA Fact Sheet: 2010/2015 PFOA Stewardship Program, retrieved from https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program (last visited March 1, 2018).

114.    Upon information and belief, Short Chain PFAS are harder to remove from the environment, and break through carbon filtration systems more easily than Long Chain PFAS.

115.    Upon information and belief, there are at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire Ltd., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which do not impair the reasonably anticipated or intended function of AFFF and are economically and technologically feasible.

## II.    PROPERTIES IMPACTED

### A.    The City Watershed

116.    The City is located in Orange County, New York, on the Hudson River about 60 miles north of New York City.

117.    The City has been listed by the NYSDEC as a potential Environmental Justice Area.

118.    The City is the owner of property ("Washington Lake Property") located at 660 Little Britain Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-12.2), which is approximately 254.96 acres, and Old Little Britain Road, in the Town of Newburgh, Orange County, New York (tax parcel identification no. 97-3-10), which is approximately 25.4 acres.

119.    The Washington Lake Property is located about three miles to the west of the City.

120.    The City pays real property taxes to the Town of New Windsor and the Town of Newburgh for the Washington Lake Property.

121.    The Washington Lake Property is the location of Washington Lake.

122.    Washington Lake is a State Class A waterbody pursuant to New York Environmental Conservation Law ("ECL") Article 15 (Water Index No. H-89-2-P225).

20

123.    Class A fresh surface waters are best used as "a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing.  The waters shall be suitable for fish, shellfish, and wildlife propagation and survival." 6 N.Y.C.R.R. §701.6.

124.    Prior to on or about May 2, 2016, Washington Lake served as the primary water intake source for the City Water System (Water System ID NY3503503549), in order to supply drinking water to at least 28,000 residents and other water users.

125.    Washington Lake receives water from sources including the drainage basins of Silver Stream and its tributaries (Class A waterbodies), Patton Brook and its tributaries (Class A waterbodies), the New York State Route 300 storm sewer network, surface water runoff and groundwater recharge ("Washington Lake Source Water").

126.    In addition to Washington Lake Source Water, the City Watershed includes lands west of Washington Lake, including land through which the New York State Thruway (I-87), Route 207 and Route 300 pass, all of the Base Property, all of or a portion of the Airport Property, and Brown's Pond ("City Watershed").

127.    Upon information and belief, the boundaries of the City Watershed are generally depicted on the Map attached as **Exhibit "A."**

128.    The City also owns the water treatment plant ("City Water Treatment Plant") at property ("Water Treatment Plant Property") located at 493 Little Britain Road, Newburgh, New York 12550 (tax parcel identification nos. 97-3-17 and 97-3-17.1[22]) and Highway 207, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-35), together with all of the water treatment equipment located on that property, as well as the water distribution

---

[22] Lot 97-3-17.1 was created in 2018 and relates to taxable value from the IRM capital improvement on Lot 97-3-17."

system consisting of piping, valves, hydrants, pump stations, raw water and finished water storage tanks.

129.    Prior to on or about 2014, the City's water distribution system required the production of approximately 6 million gallons of water per day ("MGD").

130.    Beginning in 2014, the City Water Department completed aggressive repairs of the water distribution system beyond its normal daily maintenance to reduce leakage and decrease the average daily flow.

131.    Accordingly, as a result of the City's aggressive leak detection and distribution system repair work beginning in 2014, the Water Treatment Plant has incrementally reduced its production to today's average daily flow of about 3.2 MGD.

132.    Diversion gates ("Silver Stream Diversion") from an impoundment near the junction of Routes 300 and 207 in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-3-1.1) ("Silver Stream Diversion Property") divert water from Silver Stream into the south side of Washington Lake.

133.    The City owns the Silver Stream Diversion Property.

134.    Tributaries feed Silver Stream upstream from the Silver Stream Diversion.

135.    Some of these tributaries and their sources originate on the Airport Property and/or the Base Property.

136.    The headwaters of one of Silver Stream's tributaries is a pond, referred to as Recreation Pond ("Rec Pond") (Water Index No. H-89-2), a Class C waterbody.

137.    Rec Pond is situated on land owned by the NYSDOT, which is located on the southeast side of the Base Property and/or the Airport Property, and receives surface water and sewer discharges from the Base and the Airport.

22

138.    A Class C waterbody is not suitable for drinking water.  Instead "[t]he best usage of Class C waters is fishing. These waters shall be suitable for fish, shellfish and wildlife propagation and survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes." 6 N.Y.C.R.R. § 701.8.

139.    Upon information and belief, since on or about 2012, the City and numerous citizens groups have requested that the NYSDEC reclassify Rec Pond as a Class A waterbody since it discharges directly into Silver Stream, and when the Silver Stream Diversion is open, ultimately into Washington Lake.

140.    Upon information and belief, NYSDEC has not reclassified Rec Pond as a Class A waterbody.

141.    In or about 1922, the uppermost reach of Silver Stream was impounded to create Brown's Pond (a/k/a Silver Stream Dam Reservoir), a reservoir located in Town of New Windsor, Orange County, New York (tax parcel identification no. 32-2-53) ("Brown's Pond Property").

142.    The City of Newburgh owns Brown's Pond (Water Index No. H-P 225-1-2 and P226a), and pays real property taxes to the Town of New Windsor for the Brown's Pond Property.

143.    Brown's Pond is classified as a Class A waterbody.

144.    Brown's Pond provides the headwaters for Silver Stream.

145.    Brown's Pond is recharged naturally from groundwater and surface water flow, and does not receive water from Silver Stream.

146.    The maximum available water depth of Brown's Pond is approximately 16.5 feet.

147.    Brown's Pond is a supplemental and secondary supply of drinking water for the City, and an emergency backup source of raw water for the Town of New Windsor.

148.    The City Water Department typically does not utilize Brown's Pond as a source

when the lake level drops below 10 feet, because of diminished water quality.

149.    On June 20, 2018, NYSDEC added Washington Lake and Brown's Pond to the *DRAFT New York State 2018 Section 303(d) List of Impaired/Total Maximum Daily Load Waters*.

150.    Patton Brook, a Class A waterbody, lies west of Route 300 in the Town of Newburgh, and is diverted into Washington Lake through a channel called Murphy's Ditch (tax parcel identification no. 97-2-22.1) to the north side of Washington Lake.

151.    The City owns Murphy's Ditch.

152.    The City owns several additional pieces of property which facilitate its water service, including tax parcel identification nos. 4-1-9.21, 4-1-10, 4-1-12.2, 4-1-38 in the Town of New Windsor, Orange County, New York ("Additional Water Supply Parcels").

153.    The Washington Lake Property, Water Treatment Plant Property, Brown's Pond Property, Murphy's Ditch, Silver Stream Diversion Property, and Additional Water Supply Parcels are all portions of the "City Property," as used in this Complaint.

154.    The Catskill Aqueduct, which provides water to the City of New York and other local municipalities, passes to the north of Brown's Pond.

155.    In accordance with an agreement with NYCDEP, the City may withdraw Catskill Aqueduct water when needed at a cost of approximately $1,728.99 per million gallons up to the allowance quantity of 103,276,775 gallons per month ("Allowable Consumption Quantity"), and approximately $5,200.53 per million gallons in excess of the Allowable Consumption Quantity.

156.    In order to provide water from the Catskill Aqueduct, NYCDEP made improvements to the City water supply connection to the Catskill Aqueduct west siphon and constructed the Brown's Pond blow-off structure on property identified as the Silver Stream (Brown's Pond) Station at 174 Mount Airy Road, in the Town of New Windsor, Orange County, New York (tax

parcel identification no. 32-2-52) ("Brown's Pond Station").

157.    The City has paid and is required to pay an annual permit fee ("Annual NYCDEP Permit Fee") to NYCDEP for these improvements to provide the City with clean water from the Catskill Aqueduct.

158.    To date, the State has reimbursed the City for expenses to purchase the Catskill Aqueduct water, which were on average approximately $170,000 per month in 2017.

159.    However, as a result of the Contamination, the City expects that it will be required to purchase water from the NYCDEP in perpetuity, unless the sources of the Contamination and the Contamination in the City Watershed and Washington Lake are eliminated.

160.    On or about March 2017, the City entered into negotiations with NYCDEP to enter into a contract by which the NYCDEP would provide the City $700,000 annually to maintain full reserve capacity in Brown's Pond, as measured on October 1 of each year, for the Town of New Windsor's backup water supply for four to five years to begin in 2018, which would be used during the planned shutdown periods ("Shutdowns") to repair the Catskill Aqueduct.

161.    The Shutdowns are scheduled for ten weeks annually beginning in October of each year from 2018 through 2023.

162.    As a result of the Contamination of Washington Lake, the City has not been able to move forward with this arrangement because it must keep Brown's Pond water available to use as its water supply source during the Shutdowns.

163.    Accordingly, on March 27, 2018, the City withdrew from the negotiations with NYCDEP.

164.    As a result, the City has sustained lost profits.

25

B.    The Base

165.    Base operations are located on the Base Property, which is located at 1 Maguire Way, Newburgh, New York 12550, and is composed of portions of at least two parcels (tax parcel identification numbers 89-1-79 in the Town of Newburgh, Orange County, New York, and 3-1-63.2 in the Town of New Windsor, Orange County, New York).    The Base Property is approximately 2.5 miles west of the Washington Lake.

166.    The Base Property is generally bounded by the Airport Property on the west, Route 17K to the north, Route 87 to the east, and primarily vacant land and land used for minor Base or Airport operations.

167.    The Base Property is located upgradient from Washington Lake.

168.    The Base Property is located in the City Watershed.

169.    Upon information and belief, since on or before 1982, Defendant NYSDOT has been the owner of some or all of the Base Property and the Airport Property (collectively "NYSDOT Properties").

170.    Upon information and belief, Defendant USA may own portions of the Base Property and/or Airport Property, and/or surrounding properties.

171.    Upon information and belief, the NYSDOT Properties have been used for military operations since the 1940s, and commercial operations since the 1970s.

172.    Upon information and belief, collectively the NYSDOT Properties are comprised of approximately 10,000 acres, and the Base Property consists of approximately 267 acres.

173.    The Base Property has or has had numerous operators under NYSDOT's control.

174.    USA is the current lessee of the Base Property pursuant to the terms of a lease with the NYSDOT, dated December 31, 1982 ("USA Lease").

26

175.    The United States, Air Force, USANG, and the Marine Corps Reserve are the operators of the Base and/or Base Property (and/or the portions of the Airport Property) pursuant to the USA Lease.

176.    The State operates the NYANG 105th Airlift Wing, an Air Mobility Command, at the Base pursuant to License Number DACA51-3-84-61 granted to the State from the Air Force on or about April 1, 1983.

177.    Upon information and belief, the Base Property contains approximately 36 buildings, including hangars to store aircraft, a fire house, a former fire house, a nozzle testing area, an apron, a storm sewer system, an industrial waste sewer system, outfalls, Rec Pond, and two retention ponds ("Lagoons").

178.    A 48-inch diameter pipe carrying stormwater originates in an open ditch along the south side of NYS Route 17K near the intersection of 17K and Industrial Drive, extends under the Base, and ultimately discharges to Rec Pond.[23]

179.    Upon information and belief, since the late 1960s and to the present date, at the Base Property, AFFF containing PFAS has been extensively used at crash sites, training areas, fuel tanker areas, Hangars 100-102, and fire station buildings, fire truck maintenance buildings, among other locations, without containment measures, and/or with inadequate or failing containment measures, leading to the foreseeable Disposals of PFAS into the surface water, groundwater, soil, and sediment at the Base Property and City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

180.    Upon information and belief, since the late 1960s, Discharges and Releases also likely occurred from inadequate and/or leaking storm sewer systems, inadequate and/or leaking

---

[23] *See* Figure 2: Catch Basin Sampling Locations, prepared for 105th Airlift Wing, New York Air National Guard, Stewart International Airport, dated January 2013 (Rev. No. Final), provided to the City from NYSDEC.

industrial waste streams, inadequate and/or leaking Lagoons, broken valves, leaking storage tanks, and during testing of fire suppression systems, false alarms, and maintenance, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable release of Hazardous Substances, including PFAS, into the surface water, soil, groundwater, and sediment at the Base Property and City Watershed, and the foreseeable Contamination of Washington Lake with Pollutants, including PFAS.

181.    For example, on April 30, 1990, as documented by the NYSDEC Spill Response Form for Spill No. 9001143, a spill of approximately 4,000 gallons of Ansul Ansulite 3% AFFF occurred at the Base at Building 105, the former fire station building, and discharged into the storm drain which discharges into Silver Steam, contributing to the Contamination of the City's drinking water supply.

182.    Upon information and belief, on August 10, 1990, AFFF and/or other Hazardous Substances were discharged from a lagoon and/or Rec Pond directly into Silver Stream.

183.    While the NYSDOT and/or the Base operators, including the State Defendants and Federal Defendants, were permitted to use AFFF containing PFAS at the Base, not including dumping, they had and have a duty to contain PFAS and thereby prevent PFAS from entering sediment, soil, groundwater, and surface water at the Base Property and the City Watershed in conformance with numerous military directives, the Base State Pollutant Discharge Elimination System ("SPDES") permit[24], and City Code §295-1.

184.    Upon information and belief, by 1987 or earlier, the U.S. military knew firefighting foams used at bases across the country had adverse environmental and health impacts, that the chemicals had entered streams and groundwater at several military bases, and that these firefighting

---

[24] The Base SPDES Permit is defined below in paragraph 213.

foams could potentially be polluting drinking water wells.

185.    Accordingly, by 1987 or earlier, in guidance documents, technical letters, and instruction manuals, the Air Force and other Federal defense agencies began specifically directing military employees to prevent PFAS from entering the environment, designing new environmentally acceptable training facilities, discontinuing inadequate training facilities, and requiring containment systems.

186.    Upon information and belief, at least ten years later in about 1997, after knowing of the risks from PFAS, NYSDOT and/or the operators of the Airport and Base installed the Lagoons.

187.    The westerly Lagoon is approximately 280 feet north of Rec Pond, and the easterly lagoon is approximately 350 feet northeast of Rec Pond.

188.    Upon information and belief, the Airport Operators used, continue to use, and/or are or have been in control of the westerly Lagoon, and the Base Operators used, continue to use, and/or are or have been in control of the easterly Lagoon.

189.    The intended purposes of the Lagoons were to separate major de-icing events and AFFF discharges from the stormwater drainage system and prevent high concentrations of contaminants from entering the storm drainage system.  The contents of the Lagoons would ultimately discharge to the Town of New Windsor Wastewater Treatment Facility.

190.    However, upon information and belief, the Lagoons were not designed to capture all AFFF Disposals, and did not capture all AFFF Disposals.

191.    Upon information and belief, the Lagoons failed and/or leaked, and/or did not provide adequate containment of PFAS or prevent PFAS from entering the environment.

192.    Upon information and belief, AFFF containing PFAS is currently stored, discharged,

disposed and/or released at the Base on the Base Property.[25]

193.    Upon information and belief, from January 2017 to the present, the industrial wastewater discharge permits for the Lagoons required the Airport and Base operators to provide Discharge Monitoring Reports containing sampling for six PFAS—PFOS, PFOA, PFBS, PFHpA, PFHxS, and PFNA.

194.    Upon information and belief, Discharge Monitoring Reports from January 2017 to the present have revealed PFAS in the Lagoons.

195.    Additionally, upon information and belief, other Pollutants may have been discharged at the Base on the Base Property, and may have entered sediment, soil, groundwater, and surface water at the Base Property or the City Watershed, leading to Contamination in Washington Lake.

**C.    The Airport**

196.    Airport operations are located on the Airport Property, which is located at 1180 1st Street, New Windsor, New York 12553, and is composed of numerous parcels in the Town of Newburgh and Town of New Windsor, Orange County, New York.

197.    The Airport Property is approximately 2.5 miles west of the City.

198.    The Airport Property is located upgradient from Washington Lake.

199.    The Airport Property is partially located in the City Watershed.

200.    The Airport Property currently has at least one operator under control of NYSDOT.

201.    Since on or about November 1, 2007, PANYNJ has operated the Airport on the Airport Property, pursuant to a lease with the NYSDOT.

202.    NEG Defendants operated the Airport on the Airport Property prior to PANYNJ,

---

[25] *See* "NYSDEC Class B Fire Suppression Foam Usage Survey - New York State Airports", retrieved from https://www.dec.ny.gov/docs/remediation_hudson_pdf/pfoa112817s2.pdf (last visited February 28, 2018).

pursuant to a lease with NYSDOT, dated on or about March 30, 2000.

203.    Upon information and belief, since the late 1960s and to the present date, at the Airport Property, AFFF containing PFAS has been extensively used at crash sites, fuel tanker areas, training areas, fire suppression system testing areas, the Former Nozzle Testing Area, Building 142, and Building 2241, among other locations, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable Disposals of PFAS into the surface water, groundwater, and sediment at the Airport Property and the City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

204.    Upon information and belief, since the late 1960s, Disposals of PFAS likely occurred at the Airport Property from leaking storage tanks, inadequate and/or leaking storm sewer systems, inadequate and/or leaking industrial waste streams, broken valves, and during testing of fire suppression systems, false alarms and maintenance, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable release of PFAS into the surface water, groundwater, soil, and sediment at the Airport Property and City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

205.    Upon information and belief, AFFF containing PFAS is currently stored and used at the Airport on the Airport Property.

206.    Additionally, upon information and belief, on September 5, 1996, a Douglas DC-10, operated by FedEx as Flight 1406, made an emergency landing at the Airport due to fire in the cabin.

207.    Upon information and belief, after landing, the airplane was destroyed by fire and a high-volume, broadcast of AFFF was discharged and/or released to extinguish the flames; but the AFFF was not contained or was inadequately contained.

31

208.    Additionally, regular discharges of AFFF occurred at the Former Nozzle Testing Area near Building 142, which were not contained or were inadequately contained.

209.    As a result of the Airport operators and/or owners failing to adequately contain the AFFF, the AFFF concentrate accumulated and resulted in Contamination of the soil, groundwater, and surface water at the Airport.

210.    While NYSDOT and/or the Airport operators (PANYNJ, FedEx, and the NEG Defendants) were permitted to use AFFF containing PFAS at the Airport, not including dumping, they had and have a duty to contain PFAS and thereby prevent PFAS from entering the sediment, soil, groundwater, and surface water at the Airport Property and the City Watershed.

211.    Upon information and belief, the Airport owner or operators have never remediated the PFAS Contamination.

212.    Additionally, upon information and belief, other Pollutants may have been discharged, disposed, or released at the Airport on the Airport Property, and may have entered sediment, groundwater, and surface water at the Airport Property, Base Property or City Watershed, and resulted in Contamination in Washington Lake.

**III.    SPDES PERMITS**

213.    Pursuant to SPDES Permit NY-0250457 ("Base SPDES Permit"), NYANG discharges stormwater and/or wastewater from outfalls on the Base Property (and/or Airport Property) into Rec Pond, a tributary of Silver Stream, and also from the Base into Patton Brook, and/or otherwise into the City Watershed.

214.    Section F of the Airport SPDES Permit prohibits discharges of "contained firefighting runoff, fire training water contaminated by contact with pollutants or containing foam or fire retardant additives."

32

215.    NYSANG has held the Base SPDES Permit since October 31, 2007.

216.    Upon information and belief, NYSANG and/or other operators of the Base, and/or NYSDOT as owner, discharged and continue to discharge AFFF and other Pollutants in violation of the Base SPDES Permit, leading to Contamination of the NYSDOT Property, and the City Watershed.

217.    Pursuant to SPDES Permit NY-0234915 ("Airport SPDES Permit"), PANYNJ discharges stormwater and/or wastewater from Outfall 014 into Rec Pond, a tributary of Silver Stream.

218.    The drainage area for Airport Outfall 014 is approximately 90 acres, and encompasses grass areas between Airport Runway 16/34 and the Base, and an area between the Base and Airport Runway 9/27 on the NYSDOT Property.

219.    In the Airport SPDES Permit, Airport Outfalls identified as 008, 009, 011, 012, 013, 015 list "Trib of Moodna Creek" as their receiving waters, which is Silver Stream.

220.    However, when the Silver Stream Diversion is open, Silver Stream flows directly into Washington Lake, rather than to Moodna Creek.

221.    Upon information and belief, the Silver Stream Diversion was almost always open until May 2, 2016.

222.    Upon information and belief, Airport Outfalls 008, 011, and 013 discharged stormwater and water associated with industrial activity directly into Silver Stream and ultimately into Washington Lake.

223.    Upon information and belief, Airport Outfalls 009, 012, and 015 discharge stormwater directly into Silver Stream and ultimately into Washington Lake.

224.    Section F of the Airport SPDES Permit prohibits discharges of "contained

firefighting runoff, fire training water contaminated by contact with pollutants or containing foam or fire retardant additives."

225.    PANYNJ has held the Airport SPDES Permit since on or about October 31, 2007.

226.    Prior to PANYNJ, NEG held the Airport SPDES Permit from on or about December 1, 2001 to October 30, 2007.

227.    Prior to SWF, NYSDOT held the Airport SPDES Permit from on or about December 1, 1991 to December 1, 2001.

228.    Upon information and belief, PANYNJ, NEG, NYANG, and other operators of the Airport and Base, and/or NYSDOT as owner, discharged and continue to discharge AFFF and other Pollutants in violation of the Airport SPDES Permit, leading to Contamination of the Base Property and/or Airport Property, and the City Watershed and Washington Lake.

## IV.    THE SWITCHOVER

229.    In 2009, EPA issued the Provisional Health Advisories setting the Provisional Levels of 200 ppt for PFOS and 400 ppt for PFOA.

230.    In or about April 2014, the City began testing Washington Lake influent to the Water Treatment System for six PFAS—PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFBS—pursuant to the EPA Unregulated Contaminant Monitoring Rule.

231.    Upon information and belief, from December 2013 through March 2016, at least four samples were collected from Washington Lake influent which had detections of PFOS between 140 and 170 ppt and PFOA at 27 ppt. The PFOS and PFOA levels were below the EPA 2009 Provisional Health Advisory in place at the time.

232.    Upon information and belief, from December 2013 through March 2016, at least four samples were collected from Washington Lake which had detections of PFNA of 5.7 ppt,

PFHxA of 65 ppt, PFBS of 20.9 ppt, and PFHpA between 17 ppt and 21.6 ppt.  No provisional standards were in place at the time for these PFAS compounds.

233.    As a precautionary measure, on or about May 2, 2016, the City switched the City Water System supply from Washington Lake to Brown's Pond.

234.    At the time of the City's switchover, the 2009 EPA Provisional Levels were still in effect, and neither PFOS nor PFOA had been detected above the Provisional Levels in the City's water supply.

235.    After the City's switchover to Brown's Pond, on May 19, 2016, EPA announced that it had developed the new Health Advisories for PFOA and PFOS, reducing the levels to a combined limit of 70 ppt.

236.    On or about June 7, 2016 due to decreased water levels in Brown's Pond, the City began providing its residents water blended water from Brown's Pond and the Catskill Aqueduct.

237.    By June 13, 2016, the City provided water only from the Catskill Aqueduct.  The Catskill Aqueduct water contained no measurable PFAS.

238.    Later sampling performed by NYSDEC in 2017 revealed trace amounts of PFAS in Brown's Pond below the levels set by the Health Advisories.

239.    On average, the City's current use of the Catskill Aqueduct water costs about $170,000 per month.

240.    The State has reimbursed or committed to reimbursing the City for the costs of purchasing Catskill Aqueduct water to date.

241.    The City's current contract with the State for Catskill Aqueduct water will expire in November of 2018.

242.    However, as a result of the Contamination, the City expects that it will be required

35

to purchase water from the NYCDEP in perpetuity unless the sources of the Contamination and the Contamination in the City Watershed and Washington Lake are eliminated and fully remediated.

243.    If the State stops providing funds to cover the cost to pay for clean Catskill Aqueduct water, the City will be required to increase water rates by approximately 45%.

244.    Such an increase is not affordable for City residents and other water users.

## V.    THE CONTAMINATION

245.    Beginning in or about March of 2016, the NYSDEC began a limited investigation of the surface water, groundwater, and sediment in the City Watershed, including the Base Property, Airport Property, Silver Stream, Brown's Pond and Patton Brook, Washington Lake, and other water bodies that, upon information and belief, do not feed Washington Lake.

246.    NYSDEC first provided the City with lab results from that testing on or about May 9, 2016.

247.    Upon information and belief, NYSDEC's limited investigations identified PFAS contamination in the City Watershed and Washington Lake as follows:

Washington Lake
- March 2016 samples: PFOS identified in Washington Lake surface water at levels up to 243 ppt.
- September 30, 2016 and December 1, 2016 drawdown activities conducted between samples: PFOS was identified in Washington Lake surface water at levels up to 800 ppt.  The other five PFAS compounds analyzed all had reported values above their respective reporting limits ranging from 11.1 ppt (PFBS) to 73 ppt (PFHxS).
- August 2017 samples: PFOS identified in Washington Lake surface water at levels up to 170 ppt.  Eleven other PFAS, including PFOA (30 ppt), PFHxS (69 ppt), and PFNA (20 ppt), were detected ranging from 2.4 ppt to 69 ppt.  Low levels of PFAS were also identified in the sediment at the bottom of Washington Lake.

Silver Stream
- March through May 2016 samples: PFOS identified in Silver Stream surface water at levels up to 290 ppt.
- October 2017 samples: PFOS measured in the Rec Pond tributary surface water to Silver Stream at levels up to 11,800 ppt.  PFOS measured in surface water in the Silver Stream diversion into Lake Washington at levels up to 181 ppt and total

36

PFAS[26] of 433 ppt.
- October and November 2017 samples: PFOS measured in Silver Stream surface water at levels up to 281 ppt.

Patton Brook
- May 2016 samples: PFOS identified in Patton Brook surface water at levels up to 11.3 ppt.

Base Property
- March 2016 and May 2016 samples: PFOS measured in the surface waters at Base Outfalls A, 002, 003, 017K, and 010 located at Rec Pond at a range of 60 ppt to 5,900 ppt.
- June 2016 samples: PFOS identified in the groundwater at sampling locations surrounding the apron on the Base Property at 21 ppt, 190 ppt, and 3,160 ppt.
- June 2016 and September 2016 samples: PFOS identified in the catch basin water at sample locations surrounding the apron on the Base Property ranging from 14 ppt to 6,990 ppt.
- August 2016 samples: PFOS identified in the surface soil at sample locations surrounding the apron on the Base Property at 320 ppt, 470 ppt, and 5,620 ppt.
- September 2016 samples: PFOS, PFOA, and other PFAS identified in nine surface water samples on the Base Property. PFOS was identified at a range of 17 ppt to 3610 ppt; PFOA was identified at a range of 13 ppt to 520 ppt; total PFAS ranged from 74 ppt to 5,843 ppt.
- September 2016 samples: The total PFAS identified in groundwater on the Base Property at MW-3 measured at 368 ppt.
- March 2017 samples: PFOS identified in the surface waters of the floor drains at the Base Property at the Firehouse at concentrations up to 480,000 ppt.
- October 2017 samples: PFOS identified in the Retention Basin surface water at 2,520 ppt.
- October and November 2017 samples: PFOS measured in the surface water at Base Outfalls 002, 003 and 010 located at Rec Pond at range of 607 to 1,710 ppt. PFOS identified in groundwater on the Base Property at the following Potential Release Locations ("PRL"): PRL-1 at 137 ppt; PRL-2 at 174 ppt; PRL-3 at 714 ppt; PRL-15 at 4,920 ppt; and the former base landfill at 262 ppt. PFOS identified in the surface soils at various locations throughout the Base at concentrations up to 520,000 ppt. The Total PFAS identified in groundwater on the Base property ranged from 7 ppt to 11,562 ppt. The Total PFAS identified in groundwater downgradient of the Base ranged from 34 ppt to 3,344 ppt.

Airport Property
- June 2016 samples: Combined measure of PFOS and PFOA in soil on the runway near Airport Outfall 003 at a range of 6,680 ppt to 1,845,680 ppt, and total PFAS ranging from 7,400 ppt to 1,897,580 ppt. Combined measure of PFOS and PFOA

---

[26] Upon information and belief "Total PFAS" include any and all PFAS that were sampled for, and may include up to 21 compounds, but not all PFAS that have been manufactured or used by Defendants.

in soil just north and northeast of Building 142 at a range of 6,370 ppt to 596,670 ppt, and total PFAS ranging from 7,730 ppt to 619,140 ppt.

- July 2016 samples: Combined measure of PFOS and PFOA in the surface waters at Airport Outfalls 003, 005, 008, 010, 011, and 013 at a range of 19 ppt to 306 ppt, and total PFAS ranging from 14 ppt to 462 ppt.
- July 2016 samples: PFOS in groundwater north of the runway ranging from 120 ppt to 340 ppt.

248.    Upon information and belief, trace levels of PFAS were identified in Brown's Pond below the Provisional Levels and Health Advisory in 2017.

249.    Upon information and belief, the DOD began a limited investigation of the Base Property in the fall of 2018, although results have not yet been provided to the City.

250.    Upon information and belief, additional sampling detecting PFAS may have occurred in the City Watershed.

251.    Disposals of AFFF without containment or with inadequate containment have resulted in levels of PFOS and PFOA in surface waters and sediments of Washington Lake and the City Watershed above the Health Advisories, and other PFAS in the surface waters and sediments of Washington Lake and the City Watershed.

252.    Manufacture, failure to warn, use, failure to contain, and Disposals by Defendants have led to Discharges of PFOS and PFOA and other PFAS into the waters of the United States, resulting in exceedances of the Health Advisories for PFOS and PFOA.

253.    Upon information and belief, in 2016, NYSDEC and the New York State Department of Health ("NYSDOH") tested fish in the City Watershed and Washington Lake for PFAS.

254.    Upon information and belief, effective on or about May 27, 2016, the City issued a catch and release advisory at locations of the City Watershed and Washington Lake as a precautionary measure.

38

255.    Upon information and belief, on or about May 27, 2016, the City placed signs at locations in the City Watershed alerting the public of the City's catch and release advisory.

256.    Upon information and belief, on July 24, 2017, NYSDOH and NYSDEC released the preliminary results from the 2016 fish sampling, stating that elevated levels of PFAS were identified in certain fish.

257.    Upon information and belief, effective July 24, 2017, NYSDEC and NYSDOH issued a catch and release advisory to ensure that people do not consume PFAS-contaminated fish.

258.    There may be additional sources of Contamination, which the Defendants are or should be aware of, that may also be contributing to the Contamination and that may be discovered in the course of further investigation or through the litigation discovery process.

## VI.    NYSDEC RESPONSE TO THE CONTAMINATION

259.    The New York State Constitution tasks the Legislature with, among other things, the duty:

> . . . to conserve and protect its natural resources and scenic beauty . . . The legislature, in implementing this policy, shall include adequate provision for the abatement of air and water pollution . . . , and the development and regulation of water resources.

N.Y. Const. art. XIV, § 4.

260.    The State has the "sovereign duty to conserve and control its water resources . . ." in line with its public policy, which includes, among others:

> Reasonable standards of purity and quality of the waters of the state be maintained consistent with public health, safety and welfare and the public enjoyment thereof, the propagation and protection of fish and wildlife, including birds, mammals and other terrestrial and aquatic life, and the industrial development of the state, and to that end, to require the use of all known available and reasonable methods to prevent and control pollution, wastage and unreasonable disturbance and defilement of the waters of the state.

ECL § 15-0105(7).

261.    It is the declared public policy of the State "to maintain reasonable standards of purity of the waters of the state . . . and to that end . . . prevent and control the pollution of the waters of the state of New York." ECL §17-0101.

262.    Likewise, the Legislature has declared that the State, through its agencies, is "to safeguard the waters of the state from pollution by preventing any new pollution . . . ." ECL §17-0103.

263.    Further, the State, through its agencies, shall "supervise and regulate the sanitary aspects of water supplies . . . and control the pollution of waters of the state," and "exercise control over and supervise the abatement of nuisances affecting or likely to affect public health." Public Health Law ("PHL") §201(l), (n).

264.    The State, through its agencies, may approve comprehensive studies for watershed protection projects, control the pollution of waters of the state, and exercise control over and supervise the abatement of nuisances. ECL §15-1303; PHL §1100.

265.    On or about April 26, 2016, the State issued a proposed rule to add PFOA and PFOS to the list of hazardous substances at 6 N.Y.C.R.R. §597.3.

266.    In August 2016, NYSDEC classified the Base as an Inactive Hazardous Waste Disposal Site (State Superfund Site No. 336089), and a portion of the Airport a potential Inactive Hazardous Waste Disposal Site (State Superfund Site No. 336088), citing the PFOS Contamination at the NYSDOT Properties, Washington Lake, and the City Watershed.

267.    NYSDEC determined that Discharges from operations on the Base Property and the Airport Property were the cause of the Contamination of surface water, groundwater, and sediment in the City Watershed and Washington Lake.

268.    However, the State (including NYSDEC) has not initiated enforcement action or action in a court of law against any potential responsible parties, including the Defendants.

269.    The State's Final Rule amending Part 597 of the New York State Chemical Bulk Storage regulation adding PFOA and PFOS to the list of hazardous substances at 6 N.Y.C.R.R. §597.3, and prohibiting the use of AFFF containing PFOA or PFOS by April of 2017, became effective on March 3, 2017.

270.    However, neither NYSDEC nor NYSDOH have issued maximum contaminant levels or other standards for PFOA or PFOS.

271.    While NYSDEC has installed a GAC filtration system as an IRM for future treatment of Washington Lake water, benchscale testing performed to date on Washington Lake water run through carbon units revealed that carbon was less effective in treating the Short Chain PFAS.  The Short Chain PFAS were detected in treated water sooner than PFOS and PFOA, which is referred to as "breakthrough."

272.    The NYSDEC and its consultant advised the City that the GAC is only designed to treat PFOS and PFOA, even though 10 additional PFAS have been detected above laboratory reporting limits ("RLs") — PFBS, PFHxS, PFHpA, PFNA, PFBA, PFPeA, PFHxA, PFDA, PFHpS and PFUnA ("Additional PFAS").[27]

273.    NYSDEC's limited investigation of Washington Lake in August of 2017 revealed PFNA levels as high as 20 ppt and PFHxS levels as high as 69 ppt.

274.    The 2018 ATSDR DTP determined that PFOA, PFOS, PFNA and PFHxS may be harmful to humans at levels as low as 6.9 ppt, 10 ppt, 10 ppt, and 70 ppt, respectively.

275.    The GAC cannot hold PFAS indefinitely, and ultimately breakthrough of PFAS

---

[27] *See* Table 1 at ¶58 for full definitions of these compounds.

occurs.

276.    The State has not yet issued treatment standards for any PFAS.

277.    The State committed to the City and the public that it will treat Washington Lake water to "non-detect" measures in public meetings.

278.    Yet, drafts of the Operation and Maintenance Manual ("O&MM") for the GAC filtration system provided to the City to date have not set treatment standards to "non-detect." Instead, the March 2018 draft O&MM set treatment standards of 70 ppt total for PFOS and PFOA, which is above the provisional minimal risk levels set in the 2018 ATSDR DTP.

279.    The GAC filtration system has not been approved by the City for use because there is no assurance that drinking water from Washington Lake will be free of PFAS and safe for public consumption until complete remediation of the Contamination and abatement of the Discharges has occurred.

280.    Additionally, if the GAC filtration system became operational, Washington Lake will need to be recharged. Historically, Silver Stream has been the primary recharge source for Washington Lake.

281.    If the Silver Stream Diversion is re-opened, Silver Stream water contaminated with PFAS from the Base Property and Airport Property would flow directly into Washington Lake and further contaminate it.

282.    Therefore, the GAC has not eliminated the public nuisance and imminent and substantial risk to public health of providing water contaminated with PFAS.

283.    Upon information and belief, neither NYSDEC nor NYSDOH have prohibited the use of AFFF containing PFAS other than PFOA or PFOS.

284.    Like other states, including, for example, New Jersey, it is expected that EPA and

the State will continue to promulgate stricter standards and/or advisories for PFOA and PFOS, and also create standards for all or additional PFAS, as more nationwide tests are completed.

285.    Accordingly, upon information and belief, Disposals continue to occur at the Base and Airport, which are contributing to the total PFAS Contamination levels that are already in violation of the Health Advisory.

## VII.    TESTING BY NYSDOH

286.    Beginning on or about November 2016, the NYSDOH began offering blood tests for PFOS and PFOA to City residents, individuals who work in the City, and others who have previously lived or worked in the City.

287.    According to NYSDOH, blood tests results from approximately 750 City residents indicated that, on average in comparison to the general U.S. population, City residents are in the 95th percentile for PFOS in their blood and higher than the 50th percentile for PFOA in their blood.[28]

288.    Upon information and belief, NYSDOH did not test for PFAS other than PFOS and PFOA.

289.    Accordingly, manufacture and disposal of PFAS by Defendants has led to PFOS and PFOA in the blood of the City residents, which may create an imminent and substantial hazard to health.

## VIII.    TAX ASSESSMENT

290.    The City's real property taxes for 2017 and 2018 increased as a result of capital improvements for the IRM that were installed by NYSDEC and/or NYSDEC's contractors.

---

[28]NYSDOH Information Sheet, "Newburgh Area PFC Biomonitoring Group-Level Results," https://www.health.ny.gov/environmental/investigations/newburgh/docs/infosheetgroupresults.pdf (last visited March 1, 2018).

291.    These improvements were finalized in or about March 2018.

292.    The property taxes for the City Property impacted by the IRM are expected to remain higher in the future as a result of the IRM.

293.    Further, the City continues to be required to pay real property taxes for the City Property even while it does not use Washington Lake, but rather withdraws water from the Catskill Aqueduct and makes payments to NYCDEP.

294.    On or about July 24, 2017, the City initiated a tax certiorari proceeding against the Town of New Windsor Assessor, the Board of Assessment Review of the Town of New Windsor, the Newburgh Enlarged City School District, and the County of Orange to challenge the property tax increases from 2017 in New York State Supreme Court, Orange County, captioned *City of Newburgh et al. v. The Assessor et al*, Index No. EF005922-2017.

295.    On May 22, 2018, the City filed eleven tax assessment grievances with the Towns of Newburgh and New Windsor for City Property parcels, because the Contamination has likely rendered these parcels unusable and valueless.

IX.    **OTHER PENDING LITIGATION**

296.    On September 27, 2017, the State Court Action was commenced in Orange County Supreme Court as a putative class action, alleging personal injury and property damage from water sold and distributed by the City to plaintiffs containing Contamination as a result of Defendants' Disposals and manufacturing of PFAS.

297.    On August 11, 2017, an action was commenced in Orange County Supreme Court, captioned *Sean Fogarty et al. v. The Port Authority of New York and New Jersey* ("*Fogarty v. Port Authority*"), alleging personal injury and property damage as a result of PFAS manufactured by 3M and Tyco that were discharged on the Airport Property during PANYNJ's operation of the Airport

44

into the environment and the City Watershed, and consumed by the *Fogarty* plaintiffs via their drinking water.

298.    *Fogarty v. Port Authority* was removed to federal court, and is currently pending in this Court.

### X.    DAMAGES

299.    The City seeks recovery from Defendants for injuries, damages, and losses suffered by the City as a result of Defendants' acts and omissions, including their Disposals and/or manufacture of PFAS, which have proximately resulted in Contamination in the soil, sediment, surface water, and groundwater in the City Watershed and Washington Lake.

300.    Upon information and belief, as a result of Defendants' acts and omissions, the City will incur damages associated with increased costs for operation of the City Water System, costs for an alternative water supply, remediation costs, natural resource damages, lost profits, and possibly other damages.

301.    Upon information and belief, as a result of Defendants' acts and omissions, the City has incurred and will continue to incur increases in real property taxes, diminished property values, expert witness fees, attorney's fees and costs.

**FIRST CAUSE OF ACTION AGAINST STATE DEFENDANTS,
FEDERAL DEFENDANTS, PANYNJ, NEG DEFENDANTS AND FEDEX
UNDER THE RESOURCE CONSERVATION AND RECOVERY ACT**

302.    The City repeats and realleges paragraphs 1 through 301 of this Complaint, as if set forth in this paragraph at length.

303.    The Contamination of the Airport Property, the Base Property, the City Watershed, and Washington Lake described above presents an imminent and substantial endangerment to human health and the environment.

304.   The State Defendants had notice of the endangerment posed by the NYSDOT Properties to the City Watershed by about April 2016, following NYSDEC's initial investigation beginning in or about March 2016.

305.   The latest date on which the State Defendants first had notice of the endangerment is on August 12, 2016, on which date the Base Property was listed as a State Superfund Site.

306.   The Federal Defendants had notice of the endangerment by August 12, 2016, when the Base Property was listed as a State Superfund Site.

307.   PANYNJ had notice of the endangerment by August 12, 2016, when the Base Property was listed as a State Superfund Site.

308.   On February 21, 2018, the City sent formal notices of intent to file suit under RCRA to the Federal Defendants, the State Defendants, PANYNJ, the NEG Defendants, and FedEx via registered mail, return receipt requested, with copies to the Administrator of the United States EPA, the United States Attorney General, the NYSDEC, and the New York State Attorney General, among others.

309.   The citizen suit provision of RCRA allows any "person" to commence an action "against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment…." 42 U.S.C. §6972(a)(1)(B).

310.   Pursuant to 42 U.S.C. §6903(15), the Federal Defendants, the State Defendants,

PANYNJ, NEG Defendants, and FedEx are "persons," and subject to the citizen suit provisions of RCRA, 42 U.S.C. §6972.

311.    The Hazardous Substances on the NYSDOT Properties, and in the City Watershed and Washington Lake, including but not limited to PFAS, are "solid wastes," as defined in 42 U.S.C. §6903(27), because they were discarded material resulting from Airport and/or Base operations, and they resulted in Contamination in the waters and sediments of the City Watershed and Washington Lake.

312.    The Hazardous Wastes, including but not limited to PFAS, are "hazardous wastes," as defined in 42 U.S.C. §6903(5), because, as described above, they "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed."

313.    The Federal Defendants and State Defendants have jurisdiction over the Base Property and are engaged in "activity resulting … in the disposal or management of solid waste or hazardous waste" on the Base Property, and are therefore required to comply with the requirements of RCRA, pursuant to 42 U.S.C. §6961.

314.    As described above, the Federal Defendants, the State Defendants, PANYNJ, the NEG Defendants, and FedEx are each a "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," 42 U.S.C. §6972(a), which resulted in the Contamination of the Base Property, Airport Property, City Watershed and Washington Lake, the City Water System and

the City Property.

315.    No remediation of the Contamination has occurred on the Base Property, the Airport Property, the City Property, or in the sediment or waters in the City Watershed, including Rec Pond and Silver Stream, or in the sediment or waters in Washington Lake.

316.    This Contamination presents or may present an imminent and substantial endangerment to health or the environment, including a continuing threat to the health of City residents and users of the City Water System, and to the environment, including the Base Property, the Airport Property, the City Property, the sediment and waters in the City Watershed, including Rec Pond and Silver Stream, and the sediment or waters in Washington Lake.

317.    This Court should issue an injunction, pursuant to 42 U.S.C. §6972(a), requiring the Federal Defendants, the State Defendants, PANYNJ, the NEG Defendants and FedEx to immediately investigate and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake; set treatment standards to the lowest detectable levels for Washington Lake and all drinking water sources within the City Watershed for all PFAS prior to using the GAC to filter Washington Lake water; halt all use of PFAS on the Base Property and Airport Property and install an IRM to prevent PFAS from entering Washington Lake prior to using or requiring the use of the GAC to filter Washington Lake water; and pay for all costs related to continued use of the Catskill Aqueduct water until PFAS source removal is completed, and for operation and maintenance of the GAC in perpetuity until the Remediation of Washington Lake, the City Watershed, the Base Property, and the Airport Property occurs and is completed.

318.    This Court should also award the City the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 42 U.S.C. §6972(e).

## SECOND CAUSE OF ACTION AGAINST
## THE FEDERAL DEFENDANTS, THE STATE DEFENDANTS,
## AND PANYNJ UNDER THE CLEAN WATER ACT

319.    The City repeats and realleges paragraphs 1 through 318 of this Complaint, as if set forth in this paragraph at length.

320.    The CWA generally prohibits the discharge of pollutants, except in compliance with its terms.  33 U.S.C. §1311(a).

321.    The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. §1362(12).

322.    The citizen suit provision of the CWA, 33 U.S.C. §1365(a)(1), allows "any citizen" to commence an action against "any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation".

323.    The City is a "citizen," as defined in 33 U.S.C. §1365(g), because it has interests that are adversely affected by the discharges of Hazardous Substances.

324.    The Federal Defendants, the State Defendants, and PANYNJ are "person[s]," as defined in 33 U.S.C. §1362(5).

325.    The Hazardous Substances are "pollutants," as defined in 33 U.S.C. §1362(6).

326.    The Rec Pond is a "navigable water," as defined by 33 U.S.C. §1362(7), because it is a water of the United States as defined in 33 C.F.R. §328.3.

327.    Water from the Rec Pond flows into Silver Stream and into Washington Lake, which is a Class A waterbody as set forth in 6 N.Y.C.R.R. §862.6, meaning that one of its intended uses

is as a source of drinking water.  6 N.Y.C.R.R. §701.6.

328.    Patton Brook is a "navigable water," as defined by 33 U.S.C. §1362(7), because it is a water of the United States, as defined in 33 C.F.R. §328.3.

329.    Water from the Patton Brook flows into Washington Lake, which is a Class A waterbody as set forth in 6 N.Y.C.R.R. §862.6, meaning that one of its intended uses is as a source of drinking water.  6 N.Y.C.R.R. §701.6.

330.    The Outfalls in the Base and Airport SPDES Permits are "point sources," as defined by 33 U.S.C. §1362(14).

331.    NYANG is the Permittee under the Base SPDES Permit.

332.    Section F of Base SPDES Permit prohibits discharges of "contained firefighting runoff, fire training water contaminated by contact with pollutants or containing foam or fire retardant additives."

333.    PANYNJ is the Permittee under the Airport SPDES Permit.

334.    Section F of the Airport SPDES Permit prohibits discharges of "contained firefighting runoff, fire training water contaminated by contact with pollutants or containing foam or fire retardant additives" via the Outfalls.

335.    NYANG and PANYNJ have violated, and continue to violate, the express terms of the Base and Airport SPDES Permits, in violation of the CWA, by discharging and continuing to discharge stormwater through the Outfalls containing Hazardous Substances from firefighting runoff, fire training water contaminated by contact with pollutants and containing foam or fire retardant additives.

336.    Upon information and belief, operations on the NYSDOT Properties by the Federal Defendants, the State Defendants, and PANYNJ have been and are causing or contributing to the

Discharges.

337.    These Discharges are either still occurring at the present time, or are likely to reoccur in the future.

338.    As a result, Federal Defendants, the State Defendants, and PANYNJ are and continue to be in violation of the Clean Water Act.

339.    As owner of the NYSDOT Properties, NYSDOT is liable for the Discharges.

340.    The Federal Defendants and State Defendants have jurisdiction over the Base Property and are engaged in "activity resulting, or which may result, in the discharge or runoff of pollutants" on the Base Property, and are therefore required to comply with the requirements of CWA, pursuant to 33 U.S.C. §1323.

341.    PANYNJ has jurisdiction over the Airport Property and is engaged in "activity resulting, or which may result, in the discharge or runoff of pollutants" on the Airport Property, and is therefore required to comply with the requirements of CWA, pursuant to 33 U.S.C. §1323.

342.    On February 21, 2018, the City sent formal notices of intent to file suit under the CWA to the Federal Defendants, the State Defendants, and PANYNJ via certified mail, return receipt requested, with copies to the Administrator of the United States EPA, the United States Attorney General, the NYSDEC, and the New York State Attorney General, among others.

343.    This Court should issue an injunction, pursuant to 33 U.S.C. §1365(a), requiring the Federal Defendants, the State Defendants, and PANYNJ to discontinue discharges of Pollutants in violation of the Airport and Base SPDES Permits and CWA, and to immediately investigate and remediate the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

344.    This Court should also award appropriate civil penalties to the United States

Treasury for each day of these violations of the CWA, pursuant to 33 U.S.C. §§1365(a) and 1319(d).

345.    This Court should also award the City the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 33 U.S.C. §1365(d).

### THIRD CAUSE OF ACTION AGAINST THE STATE DEFENDANTS, FEDERAL DEFENDANTS, PANYNJ, NEG DEFENDANTS, AND FEDEX UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT

346.    The City repeats and realleges paragraphs 1 through 345 of this Complaint, as if set forth in this paragraph at length.

347.    The State and Federal Defendants, PANYNJ, NEG Defendants, and FedEx are "persons," as defined by Section 101(21) of CERCLA, 42 U.S.C. §9601(21).

348.    The Base, Airport and NYSDOT Properties (together "Facilities") are "facilities," as defined by CERCLA §101(9), 42 U.S.C. §9601(9).

349.    Some or all of the Hazardous Substances are designated "hazardous substances" under CERCLA §102(a), 42 U.S.C. §9602, and thus are "hazardous substances" under CERCLA §101(14), 42 U.S.C. §9601.

350.    The State and Federal Defendants, PANYNJ, NEG Defendants, and FedEx owned and/or operated the Facilities during a time period when the Hazardous Substances were released into the environment at the Facilities.

351.    Defendants are therefore "covered persons" liable under CERCLA §107(a)(2), 42 U.S.C. §9607(a)(2).

352.    The Disposals of Hazardous Substances by the Defendants are "Releases" within the meaning of CERCLA §101(22), and have resulted in the Contamination of the City Property, the sediment in the City Watershed, including Silver Stream, and the sediment in Washington Lake.

353.    The State and Federal Defendants, PANYNJ, NEG Defendants, and FedEx are liable

under CERCLA §107(a), 42 U.S.C. §9607(a), because they generated and disposed of the Hazardous Substances, and they owned and/or operated the Facilities when Hazardous Substances were stored, used, disposed, or otherwise released on the Facilities.

354.    As a result of the Releases or threatened Releases of the Hazardous Substances, the City has incurred and continues to incur "response" costs within the meaning of CERCLA §§101(23)-(25), 42 U.S.C. §§9601(23)-(25), including costs associated with the retention of an environmental consultant, and other response actions taken to reduce exposure to the Hazardous Substances.

355.    All such costs are necessary costs of response and, to the extent required, consistent with the National Contingency Plan.

356.    The City will continue to incur such response costs in the future.

357.    The City is entitled to full reimbursement from State and Federal Defendants, PANYNJ, NEG Defendants, and FedEx for all such response costs, pursuant to CERCLA §107(a), 42 U.S.C. §9607(a).

358.    The City did not pollute the NYSDOT Properties or the City Property, contaminate the City Watershed or Washington Lake, or otherwise cause the releases of Hazardous Substances.

359.    Accordingly, State and Federal Defendants, PANYNJ, NEG Defendants, and FedEx are strictly, jointly and severally liable under CERCLA §107(a), 42 U.S.C. §9607(a) for all response costs incurred by the City.

### FOURTH CAUSE OF ACTION AGAINST THE STATE DEFENDANTS, PANYNJ, NEG DEFENDANTS, AND FEDEX FOR NEGLIGENCE

360.    The City repeats and realleges paragraphs 1 through 359 of this Complaint, as if set forth in this paragraph at length.

361.    The State Defendants, PANYNJ, the NEG Defendants, and FedEx (including their

officers, agents, servants, and/or employees) owed and still owe a duty to the City to properly and carefully handle the Hazardous Substances, and not to permit or allow Hazardous Substances to contaminate the City Watershed or Washington Lake.

362.    The State Defendants, PANYNJ, the NEG Defendants, and FedEx (including their officers, agents, servants, and/or employees) also owed and still owe a duty to the City to promptly and responsibly respond to known releases of Pollutants in a manner which would prevent exposure to the Contamination, and otherwise protect the City and its residents from the Contamination and resulting impacts.

363.    The State Defendants, PANYNJ, the NEG Defendants, and FedEx (including their officers, agents, servants, and/or employees) acted unreasonably and negligently and breached those duties by their negligent and reckless acts and omissions in owning, operating, maintaining, and controlling the Facilities, by the improper release and disposal of the Hazardous Substances, by the failure to properly handle, dispose of, contain and abate the Hazardous Substances at, and released from, the Facilities, and by their failure to promptly and effectively investigate and address the Contamination.

364.    The State Defendants, PANYNJ, the NEG Defendants, and FedEx (including their officers, agents, servants, and/or employees) also breached their duty to timely warn the City of the risk of the Contamination in the City Watershed and Washington Lake, and the risk of harm due to the presence of the Contamination.

365.    These breaches of duties to the City are continuing and have proximately caused substantial injury and damage to the City, including, but not limited to, injury in the form of damages to the City Watershed, the City's Water Supply and the City Property, all due to the actual presence of Contamination.

366.    As a result of these breaches, the City is required to undertake additional, extensive monitoring and treatment of the drinking water it provides to its residents, incurring significant costs well into the future.

367.    Accordingly, the State Defendants, PANYNJ, the NEG Defendants, and FedEx are jointly and severally liable to the City for its damages proximately caused by such negligence and recklessness, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and responsible for investigation, cleanup, and removal of the Contamination.

368.    Further, this Court should issue an injunction requiring the State Defendants, PANYNJ, the NEG Defendants, and FedEx to immediately investigate, removal all sources of Hazardous Substances and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

369.    The damage done to the City Watershed and Washington Lake requires remedial action to eliminate the damage.

370.    The State should control and protect the City Watershed from the Contamination and further contamination through implementation of a watershed protection plan, immediate abatement of the nuisances, and remediation of the City's Watershed and Washington Lake.

371.    If the State fails to exercise its duty to control and prevent the Pollutants from entering the City Watershed and Washington Lake, the remediation will be ineffective.

**FIFTH AND ALTERNATIVE CAUSE OF ACTION**
**AGAINST THE STATE DEFENDANTS**
**FOR INVERSE CONDEMNATION**

372.    The City repeats and realleges paragraphs 1 through 371 of this Complaint, as if set

forth in this paragraph at length.

373.    The State Defendants and PANYNJ contaminated water flowing into Washington Lake and the sediment in Washington Lake, which was a physical and/or regulatory taking of the City's littoral property rights, amounting to exercise of dominion and control.

374.    The intrusion by the State Defendants and PANYNJ into Washington Lake interfered with the City's property rights to the water in Washington Lake to such a degree that this conduct amounted to an unconstitutional taking.

375.    The State Defendants and PANYNJ, by reason of this intrusion, interference and taking, are liable for all of the damages to the City arising from the inverse condemnation and *de facto* taking.

### SIXTH CAUSE OF ACTION AGAINST THE STATE DEFENDANTS, PANYNJ, NEG DEFENDANTS, AND FEDEX FOR STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITIES

376.    The City repeats and realleges paragraphs 1 through 375 of this Complaint, as if set forth in this paragraph at length.

377.    Use, storage, and Disposal of Hazardous Substances and Hazardous Waste and leaving them in an unremediated, unmonitored, unreported and unsecured condition, is an abnormally hazardous activity.

378.    The State Defendants, PANYNJ, the NEG Defendants, and FedEx (including their officers, agents, servants, and/or employees) engaged in abnormally dangerous activities by the manner in which they used, stored, and Disposed of Hazardous Substances and Hazardous Wastes at the Facilities, which: (a) created a high degree of risk of harm to others, and particularly to the City, whose property has been adversely affected by the Contamination; (b) created a risk involving a likelihood that the harm threatened by the activities of State Defendants, PANYNJ, the NEG

Defendants and FedEx would be great; (c) created a risk of harm that could not be eliminated by reasonable care; (d) were not a matter of common usage; and (e) were inappropriate to the place that they were being carried on, in that they were not contained, but were allowed to flow into the source of water for the City's residents, which imposed an unusual and extraordinary risk of harm to the City and its residents.

379.    The risks posed by these Defendants' conduct at the Facilities are such as give rise to an absolute duty to the City.

380.    As a direct and proximate result of the conduct of State Defendants, PANYNJ, the NEG Defendants, and FedEx in engaging in the abnormally dangerous activities alleged above, Hazardous Substances and Hazardous Waste generated and stored at the Facilities have and continue to exist under and around the Airport Property and Base Property, resulting in the contamination of surface water and groundwater, including the City Watershed and Washington Lake.

381.    The harm sustained by the City is exactly the kind of harm posed by the State Defendants, PANYNJ, the NEG Defendants, and FedEx, the possibility of which made the activities of State Defendants, PANYNJ, the NEG Defendants, and FedEx abnormally dangerous.

382.    By reason of these abnormally dangerous activities, State Defendants, PANYNJ, the NEG Defendants and FedEx are jointly and severally strictly liable to the City for its damages proximately caused by such negligence and recklessness, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and responsible for investigation, cleanup, and removal of the Contamination.

383.    Further, this Court should issue an injunction requiring the State Defendants, PANYNJ, the NEG Defendants, and FedEx to immediately investigate and remediate the Base

Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

### SEVENTH CAUSE OF ACTION AGAINST THE MANUFACTURER DEFENDANTS FOR STRICT PRODUCTS LIABILITY FOR DEFECTIVE DESIGN

384. The City repeats and realleges paragraphs 1 through 383 of this Complaint, as if set forth in this paragraph at length.

385. Upon information and belief, AFFF meeting MIL-F-24385 specifications was only developed and manufactured by the Manufacturer Defendants.

386. The Manufacturer Defendants also manufactured commercial grade AFFF.

387. AFFF, as designed and distributed by the Manufacturer Defendants, posed and continues to pose a substantial likelihood of harm resulting from exposure of the PFAS contained in the AFFF.

388. The Manufacturer Defendants knew or should have known that exposure to PFAS, and therefore exposure to their products, was hazardous to the environment and to human health.

389. Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants to be used posed a substantial likelihood of resulting in PFAS Contamination where they were used, proximately resulting in the PFAS Contamination of the City Water Supply.

390. Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants with inadequate containment did in fact result in PFAS Contamination in the areas in which they were used, proximately resulting in the PFAS Contamination of the City Water Supply.

391. The Manufacturer Defendants knew or should have known that the use of their AFFF

products in the exact manner in which they were designed to be used with inadequate containment would result in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS Contamination of the City Water Supply.

392.    Knowing of the dangerous and hazardous properties of their products, the Manufacturer Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFAS.

393.    Safer alternative designs of AFFF that prevent and/or significantly reduce the risk of the City's injuries without impairing the reasonably anticipated or intended function of the product exist and existed at the time the Manufacturer Defendants manufactured and distributed their AFFF, and these designs were economically and technologically feasible.

394.    These alternative designs and/or formulations were already available and/or are available, practical, and similar in cost.

395.    Safety design features that could have prevented and/or significantly reduced the risk of the City's injuries without impairing the reasonably anticipated or intended function exist and existed at the time the Manufacturer Defendants manufactured and distributed AFFF, and were economically and technologically feasible.

396.    The Manufacturer Defendants' products, used as intended, did in fact contaminate the City Water Supply, resulting in the exposure of the City's residents to potentially harmful PFAS.

397.    As a result of the Manufacturer Defendants' failure to redesign the AFFF and provide adequate safety provisions, the AFFF was unreasonably dangerous, and a defective product.

398.    Products containing PFAS are dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

399.    As commercial manufacturers, the Manufacturer Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

400.    The foreseeable risk of harm to the public health caused by the Manufacturer Defendants' AFFF outweighed the cost to the Manufacturer Defendants of reducing or eliminating such risk.

401.    The AFFF was used in a reasonably foreseeable manner and without substantial change in the condition of the product.

402.    As a direct and proximate result of the Manufacturer Defendants' defective design of AFFF, the City Water Supply has been contaminated by PFAS, proximately resulting in damages to the City.

403.    The acts and omissions of the Manufacturer Defendants were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of the City and the rights and health of its residents.

404.    The Manufacturer Defendants are therefore liable for all of the damages to the City to the City for its damages proximately caused by such defective design, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, removal and remediation of the Contamination.

405.    The Manufacturer Defendants are strictly, jointly and severally liable for all such damages and responsibility, and as the only manufacturers of AFFF meeting MIL-F-24385 specifications, the Manufacturer Defendants are liable for their individual share of the market for such products.

406.    Further, this Court should issue an injunction requiring the Manufacturer Defendants to immediately investigate and remediate the Base Property, the Airport Property, the City Property,

the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the

sediment and waters of Washington Lake.

**EIGHTH CAUSE OF ACTION AGAINST THE
MANUFACTURER DEFENDANTS FOR
STRICT PRODUCTS LIABILITY FOR FAILURE TO WARN**

407.    The City repeats and realleges paragraphs 1 through 406 of this Complaint, as if set

forth in this paragraph at length.

408.    The AFFF as designed and distributed by the Manufacturer Defendants poses a

substantial likelihood of harm resulting from exposure of the PFAS contained in the AFFF.

409.    The Manufacturer Defendants knew or should have known that exposure to PFAS,

and therefore exposure to their products, was hazardous to the environment and to human health.

410.    Use of the Manufacturer Defendants' AFFF products in the exact manner in which

they were designed by the Manufacturer Defendants to be used without adequate safety measures

poses a substantial likelihood of resulting in PFAS Contamination in the areas in which they were

used, proximately resulting in the PFAS Contamination of the City Water Supply.

411.    Use of the Manufacturer Defendants' AFFF products in the exact manner in which

they were designed by the Manufacturer Defendants did in fact result in PFAS Contamination in

the areas in which they were used, proximately resulting in the PFAS Contamination of the City

Water Supply.

412.    The Manufacturer Defendants knew or should have known that the use of their AFFF

products in the exact manner in which they were designed to be used would result in PFAS

Contamination in the areas in which they were used, proximately resulting in the PFAS

Contamination of the City Water Supply.

413.    Knowing of the dangerous and hazardous properties of their products, the

Manufacturer Defendants had a duty to warn of the hazards associated with their projects contaminating the environment, including drinking water.

414.    The Manufacturer Defendants' AFFF products containing PFAS should not have been manufactured in their particular design at all, but having been manufactured, adequate instructions and warnings should have been provided with the products.

415.    Had the Manufacturer Defendants provided adequate warnings, measures could have been taken to avoid or decrease exposure to PFAS.

416.    Had the Manufacturer Defendants provided adequate warnings, the users of AFFF at the Airport and the Base could have taken steps to reduce or prevent the release of PFAS into the environment.

417.    Adequate warnings could have included, but are not limited to:

    a)    A warning not to allow the AFFF to enter soils, sediment, groundwater, or waterways;

    b)    A warning to immediately collect AFFF upon use; and

    c)    A warning that, because the Manufacturer Defendants' AFFF contained constituents such as PFAS, which pose risks to human health and the environment, use of AFFF containing PFAS requires immediate containment and remediation after use in all scenarios.

418.    The Manufacturer Defendants' failure to provide adequate and sufficient warnings for the AFFF they manufactured, marketed, and sold rendered the AFFF a defective product.

419.    Because, or to the extent, the AFFF was used exactly as designed, the harm resulting from its use was reasonably foreseeable, and thus proximately caused by the Manufacturer Defendants' actions or inaction.

420.    As a direct and proximate result of the Manufacturer Defendants' defective design of AFFF, the City Water Supply has been contaminated by PFAS, proximately resulting in damages to the City.

421.    The Manufacturer Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of the City and the rights and health of its residents.

422.    The Manufacturer Defendants are therefore liable for all of the damages to the City proximately caused by such failure to warn, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

423.    The Manufacturer Defendants are strictly, jointly and severally liable for all such damages and responsibility, and as the only manufacturers of AFFF meeting MIL-F-24385 specifications, the Manufacturer Defendants are liable for their individual share of the market for such products.

424.    Further, this Court should issue an injunction requiring the Manufacturer Defendants to immediately investigate, remove sources of the Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

### NINTH CAUSE OF ACTION AGAINST THE
### MANUFACTURER DEFENDANTS FOR NEGLIGENCE

425.    The City repeats and realleges paragraphs 1 through 424 of this Complaint, as if set forth in this paragraph at length.

426.    The Manufacturer Defendants knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

427.    AFFF as designed and distributed by the Manufacturer Defendants poses a

substantial likelihood of harm resulting from exposure of the PFAS contained in the AFFF.

428.    The Manufacturer Defendants knew or should have known that exposure to PFAS, and therefore exposure to their products, was hazardous to the environment and to human health.

429.    Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants to be used poses a substantial likelihood of resulting in PFAS contamination in the areas in which they were used, and in the PFAS Contamination of the City Water Supply.

430.    Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants did in fact result in PFAS Contamination in the areas in which they were used, resulting in resulting in the PFAS Contamination of the City Water Supply.

431.    The Manufacturer Defendants knew or should have known that the use of their AFFF products in the exact manner in which they were designed to be used would result in PFAS Contamination in the areas in which they were used, resulting in the PFAS Contamination of the City Water Supply.

432.    The Manufacturer Defendants, including their officers, agents, servants, employees, and/or predecessors, owed a duty of care to the City to design, market, label, and instruct such that their AFFF would be used in a manner so as to prevent it from contaminating the environment and to prevent residents of the City from being harmfully exposed to PFAS contained in the AFFF.

433.    As commercial manufacturers of AFFF, the Manufacturer Defendants owed a duty of care to the City to not place into the stream of commerce a product that was in a defective condition and unreasonably dangerous to the City Water Supply.

434.    The Manufacturer Defendants also had a duty to warn of the hazards associated with

AFFF and the PFAS it contained entering the environment and drinking water.

435.   The Manufacturer Defendants, including their officers, agents, servants, employees, and/or predecessors acted unreasonably, negligently, and recklessly in manufacturing and designing the AFFF, and in failing to warn the purchasers of the AFFF of its harmful properties and of the safest way to use it.

436.   The Manufacturer Defendants breached their duties to the City by negligently manufacturing and distributing such unreasonably dangerous products into the stream of commerce, even when they knew or should have known about the dangers PFAS posed to human health and the environment, including drinking water.

437.   Because, or to the extent, the AFFF was used exactly as designed, the harm resulting from its use was reasonably foreseeable, and thus proximately caused by the Manufacturer Defendants' actions or inaction.

438.   The Manufacturer Defendants' manufacture of the AFFF and failure to warn was a direct and proximate cause of environmental and health impacts from PFAS that came from the use, storage, and disposal of AFFF at the Base and the Airport.

439.   The Manufacturer Defendants are therefore liable for all of the damages to the City to the City for its damages proximately caused by such negligence and recklessness, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

440.   The Manufacturer Defendants are strictly, jointly and severally liable for all such damages and responsibility, and as the only manufacturers of AFFF meeting MIL-F-24385 specifications, the Manufacturer Defendants are liable for their individual share of the market for such products.

441.    Further, this Court should issue an injunction requiring the Manufacturer Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

### TENTH CAUSE OF ACTION AGAINST
### THE STATE DEFENDANTS, MANUFACTURER DEFENDANTS,
### PANYNJ, NEG DEFENDANTS, AND FEDEX FOR PUBLIC NUISANCE

442.    The City repeats and realleges paragraphs 1 through 441 of this Complaint, as if set forth in this paragraph at length.

443.    The State Defendants, the Manufacturer Defendants, PANYNJ, the NEG Defendants, and FedEx (including their officers, agents, servants, and/or employees), by causing the Contamination, have interfered with the rights common to all, including groundwater, surface waters including the City Watershed and Washington Lake, the City Water System, and public lands.

444.    The City, as a property owner of the City Property and operator of the City Water System, has sustained special damages from this public nuisance.

445.    Accordingly, State Defendants, the Manufacturer Defendants, PANYNJ, the NEG Defendants, and FedEx are jointly and severally liable to the City for its damages proximately caused by such public nuisance, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

446.    The Manufacturer Defendants are not only jointly and severally liable with the State Defendants, PANYNJ, the NEG Defendants, and FedEx for that public nuisance, but also, as the only manufacturers of AFFF meeting MIL-F-24385 specifications, the Manufacturer Defendants

are liable in relation to their individual share of the market for such products.

447.    Further, this Court should issue an injunction requiring the State Defendants, the Manufacturer Defendants, PANYNJ, the NEG Defendants, and FedEx to immediately halt all Disposals; investigate and remove sources of Contamination; and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

## ELEVENTH CAUSE OF ACTION AGAINST THE
## THE STATE DEFENDANTS, MANUFACTURER DEFENDANTS,
## PANYNJ, NEG DEFENDANTS, AND FEDEX FOR TRESPASS

448.    The City repeats and realleges paragraphs 1 through 447 of this Complaint, as if set forth in this paragraph at length.

449.    The State Defendants, the Manufacturer Defendants, PANYNJ, the NEG Defendants, and FedEx, by their intentional acts and omissions and/or the intentional acts and omissions of their officers, agents, and/or employees, caused Contamination to flow from the NYSDOT Properties into the Rec Pond, down Silver Stream and enter Washington Lake, and into Patton Brook, down Silver Stream and enter Washington Lake.

450.    The Contamination was the inevitable result of those intentional acts and omissions.

451.    The State Defendants and PANYNJ by their acts and omissions, or the acts or omissions of their agents, employees or predecessors, have interfered with the rights of the City to exclusive possession of Washington Lake and the Washington Lake Property, and threaten to do so in the future.

452.    Accordingly, State Defendants, the Manufacturer Defendants, PANYNJ, the NEG Defendants, and FedEx are jointly and severally liable, by reason of this trespass, to the City for its damages proximately caused by such public nuisance, including damages to the City Watershed

67

and Washington Lake, the City Water System and the City Property, and responsible for investigation, cleanup, and removal of the Contamination.

453.    The Manufacturer Defendants are not only jointly and severally liable with the State Defendants, PANYNJ, the NEG Defendants, and FedEx for that trespass, but also, as the only manufacturers of AFFF meeting MIL-F-24385 specifications, the Manufacturer Defendants are liable in relation to their individual share of the market for such products.

454.    Further, this Court should issue an injunction requiring the State Defendants, Manufacturer Defendants, PANYNJ, the NEG Defendants, and FedEx to immediately investigate and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

## TWELFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR EQUITABLE AND/OR IMPLIED INDEMNIFICATION

455.    The City repeats and realleges paragraphs 1 through 454 of this Complaint, as if set forth in this paragraph at length.

456.    Defendants, including their officers, agents, servants, employees, and/or lessees, had a non-delegable duty to the City and the public to prevent, clean up, or ensure against the Contamination and to prevent the Discharge of Pollutants into the City Watershed.

457.    As a result of the breach of this duty by Defendants, including their officers, agents, servants, employees, and/or lessees, the defendants are responsible for the City's expenses and damages in investigation, remediation, cleanup, and removal of, and response to the Contamination, and as a result, the Defendants should, in equity, indemnify the City for its expenses, costs, and damages.

## THIRTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## FOR RESTITUTION

458. The City repeats and realleges paragraphs 1 through 457 of this Complaint, as if set forth in this paragraph at length.

459. It would be against equity and good conscience to permit the Defendants to pass the burden of cleaning up the Contamination to the City, and to have had the benefit of enjoyment of the use of, or work on, the Base Property and the Airport Property and/or manufacture and sale of AFFF, free of any responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination.

460. Therefore, Defendants should make restitution to the City for all of its expenses, costs, and damages, including attorneys' fees and costs incurred in defending itself in the State Court Action.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff City requests a trial by jury on all counts so triable, and Judgment:

(1) Granting Permanent Injunctions to abate the public nuisance and imminent and substantial endangerment to health and the environment as follows:

a. Restraining Defendants from the use or storage of AFFF containing any form of PFAS at the Facilities;

b. Directing Defendants to immediately abate, contain, and remediate ongoing Disposals of all PFAS and other Contamination, including but not limited to PFOS and PFOA, that may present an imminent and substantial endangerment to health or the environment;

c. Directing Defendants to immediately install an IRM to prevent PFAS and other Contamination from entering the City Watershed, Washington Lake and the City Water Supply, including surface water, groundwater, and sediments;

d. Directing that all IRMs treat for all PFAS to their Method Detection Limits;

e. Directing Defendants to fully investigate (including a hydrology study), identify sources of, remove and remediate the Contamination of the groundwater, surface water, soil and sediments of the Facilities, Washington Lake, Silver Stream, and other related water bodies in the City Watershed;

f. Directing Defendants to pay for costs incurred by the City to continue to receive clean water from the Catskill Aqueduct until all abatement, removal and remediation is complete, and providing safe, contaminant and/or Pollutant free water transported from an acceptable source to the City Water Treatment Plant for filtration during any future shutdown of the Catskill Aqueduct by NYCDEP;

g. Directing Defendants to pay for the City's independent consultants to perform independent analysis of all IRMs and remedial measures;

h. Directing Defendants to pay for all interim remedial costs; and

i. Directing the State to institute formal watershed protection measures, including regulations and enforcement procedures in accordance with its duties;

(2) Declaring NYSANG's and PANYNJ's SPDES permits null and void as a violation of law for discharging Pollutants into a Class A waterbody; and prohibiting NYSANG and PANYNJ from obtaining a new SPDES permit until an alternative to AFFF containing PFAS is implemented and an IRM is installed to prevent PFAS from entering the City Watershed and Washington Lake; and

70

(3)     Awarding all response costs incurred by the City under CERCLA, including, but not limited to, costs of investigation, and declaring that Defendants are liable for all response costs to be incurred by the City and others under CERCLA.

(4)     Awarding attorneys' fees and costs for the defense by the City of the State Lawsuit against City and to challenge tax assessments of City Property.

(5)     Awarding all costs and disbursements from this litigation, including attorneys' fees and expert witness fees), pursuant to 42 U.S.C. §6972(e) and 33 U.S.C. §1365(d).

(6)     Awarding civil penalties to the United States Treasury for each day of violation of the CWA, pursuant to 33 U.S.C. §§1365(a) and 1319(d).

(7)     Directing Defendants to defend and indemnify the City in the State Court Action, and any and all future claims against the City resulting from the Contamination; and provide costs to the City for purposes of providing rebates and/or refunds to consumers/property owners/residents for retroactively purchasing, consuming and bathing in water containing the Contamination;

(8)     Awarding the City compensatory damages, awarding the City compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law, and attorneys' fees and costs, including pre-judgment and post-judgment interest;

(9)     Awarding punitive damages from the Manufacturer Defendants in an amount to be determined at trial;

(10)     Pre-judgment and post-judgment interest; and

(11)     Granting such further relief as the Court deems just and proper.

Plaintiff reserves the right to amend this Complaint.

Dated: August 6, 2018                   /s/ Alan J. Knauf
                                        **KNAUF SHAW LLP**
                                        *Attorneys for Plaintiff*
                                        Alan J. Knauf, Esq.,
                                          Meaghan A. Colligan, Esq., and
                                          Amy K. Kendall, Esq., of Counsel
                                        1400 Crossroads Building
                                        2 State Street
                                        Rochester, New York 14614
                                        Tel.: (585) 546-8430

                                        **RODENHAUSEN CHALE LLP**
                                        *Attorneys for Plaintiff*
                                        George A. Rodenhausen, Esq., of Counsel
                                        20 Spring Brook Park
                                        Rhinebeck, New York 12572
                                        Tel.: (845) 516-4323

                                        **HODGES, WALSH, MESSEMER & BURKE LLP**
                                        *Attorneys for Plaintiff*
                                        John J. Walsh, Esq., of Counsel
                                        55 Church Street, Suite 211
                                        White Plains, New York 10601
                                        Tel.: (914) 385-6000